**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

       Plaintiff,

   v.

JOSEPH ORTIZ, et al.,

       Defendants.

No. C 12-00119 SI

**ORDER DENYING MOTION TO SUPPRESS WIRETAP EVIDENCE**

On December 20, 2013, the Court heard argument on a motion to suppress wiretap evidence, brought by defendants Benjamin Campos-Gonzalez, Victor Flores, Justin Whipple, and Armando Acosta. Having considered the arguments of counsel and the papers submitted, the Court DENIES the defendants' motion.

**BACKGROUND**

In July, 2012, the grand jury returned a thirty-two count indictment, charging the defendants, and fifteen other individuals, with multiple criminal acts, including violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). *See generally* Second Superseding Indictment.

The investigation that culminated in the indictment in this case began in December, 2010, and was sparked by three homicides and six attempted homicides that law enforcement believed to be linked to activities of a criminal organization. *Id.* ¶¶ 78-88. In brief, on December 18, 2010,

**United States District Court**
For the Northern District of California

1    three individuals were shot as they drove away from a Daly City, California liquor store.  Declaration

2    of Stuart Hanlon in Support of Defendants' Motion to Suppress Wiretap Evidence ("Hanlon Decl.") Exs.

3    A-3, B-3, C-3.  At least two of the victims were members of Sureño gangs.  *Id.* Exs. A-3, B-3, C-3.  A

4    witness later identified the suspects as Norteño gang members, in particular, members of the 500

5    Block/C Street Gangs.[1]  *Id.* Exs. A-3, B-3, C-3.  On December 22, 2011, six individuals were shot in

6    South San Francisco, California; three of them died.  *Id.* Exs. A-3, B-3, C-3.  The December 22 incident

7    was later revealed to be the result of an internecine feud between rival Norteño factions.  Law

8    enforcement suspected the same 500 Block/C Street Gang members were involved in both incidents.

9

10          On May 4, 2011, San Mateo County Superior Court Judges John Grandsaert and Susan M. Breall

11    authorized wiretaps on ten different telephone lines, subscribed to by individuals connected to the

12    suspect 500 Block/C Street Gangs, for a thirty-day period.[2]  *See id.* Ex. A-1.  The same judges

13    authorized wiretaps of two additional telephones on May 11 and May 12, 2011, respectively.  *Id.* Exs.

14    B-1, C-1.  On July 1, 2011, this Court authorized wiretaps on two telephone numbers, for a period of

15    thirty days.  *Id.* Ex. D-1.  On August 3, 2011, the Court authorized a second wiretap, again for two

16    telephone lines.  *Id.* Ex. E-1.  On August 18, 2011, the government terminated the second set of

17    wiretaps, before the period of authorization had ended.  Government's Opposition to Defendants'

18    Motion to Suppress Wiretap Evidence ("Gov.'s Opp'n") Ex. A.

19          The defendants now seek to suppress all evidence derived from the state and federal wiretap

20    orders, claiming: (1) the state wiretap orders were not supported by probable cause; (2) the state wiretap

21    applications failed to identify the target telephones with requisite particularity; (3) the first federal

22

23    [1]The indictment alleges that,  since the mid-2000s, two Norteño gang factions in South San
      Francisco – the 500 Block Gang and the C Street Gang – have essentially functioned as a unified,
24    association-in-fact enterprise.  Second Superseding Indictment ¶ 11.

25    [2]The state court judges actually signed an earlier wiretap authorization on April 29, 2011, and
      May 2, 2011, respectively.  *See* Hanlon Decl. Ex. F-1.  The earlier authorization permitted the
26    government to place wiretaps on the same ten telephones that were the subject of the May 4, 2011
      authorization.  *Id.*  The May 4, 2011 wiretap authorization is merely a revised version of the earlier state
      court authorization, the only difference being that the earlier application referred to the target cellular
27    telephones by both their phone numbers and their electronic serial numbers, while the second
      application omitted the electronic serial numbers.  *Compare* Hanlon Decl. Ex. F-1; *with Id.* Ex. A-1.
28    The government contends that the initial wiretap order was not served on the telephone companies and
      it is therefore not subject to this motion.  Gov.'s Opp'n at 3.

**United States District Court**
For the Northern District of California

1   wiretap order was invalid because it exceeded the scope of the Attorney General's authorization; and

2   (4) the first federal wiretap order was facially deficient because it permitted continued surveillance after

3   the purported goal had been accomplished. Defendants' Motion to Suppress Wiretap Evidence ("Def.s'

4   Mot.") at 2.

6   **LEGAL STANDARD**

7   Under the Fourth Amendment, a search warrant may not issue without probable cause. U.S.

8   Const. amend. IV. Probable cause exists where the issuing judge can determine that there is a "fair

9   probability" that the evidence sought will be found in the place searched. *Illinois v. Gates*, 462 U.S.

10  213, 238 (1983) ("The task of the issuing magistrate is simply to make a practical, common-sense

11  decision whether, given all the circumstances set forth in the affidavit before him, including the

12  'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability

13  that contraband or evidence of a crime will be found in a particular place."). In determining whether

14  a search warrant was based upon probable cause, the district court is "limited to the information and

15  circumstances contained within the four corners of the underlying affidavit." *United States v. Stanert*,

16  762 F.2d 775, 778 (9th Cir. 1985), *amended on other grounds*, 769 F.2d 1410 (9th Cir. 1985).

17  Review of a determination that a warrant was supported by probable cause is deferential; "the

18  duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . .

19  conclud[ing]' that probable cause existed." *Gates*, 462 U.S. at 238-39 (alteration in original); *see also*

20  *United States v. Kelley*, 482 F.3d 1047, 1050 (9th Cir. 2007) ("Normally, we do not 'flyspeck' the

21  affidavit supporting a search warrant through de novo review; rather, the magistrate judge's

22  determination should be paid great deference." (internal quotation marks omitted)).

23  In the context of wiretaps, a wiretap order should only issue where the government can

24  demonstrate: (1) probable cause that an individual has committed, is committing, or will commit an

25  enumerated offense; (2) probable cause that communications regarding that offense will be intercepted;

26  and (3) that ordinary investigative techniques have been or will be unsuccessful. 18 U.S.C. §

27  2518(3)(a)-(c). An application for a wiretap must include "a full and complete statement of the facts

28  and circumstances" justifying the need for the wiretap; including the offenses committed, a description

**United States District Court**
For the Northern District of California

1  of the facilities from which the communications will be intercepted, a description of the types of

2  communications anticipated, and the identities of the individuals who committed the offenses or whose

3  communications are sought, if known to the affiant. *Id.* § 2518(1)(b).

4          Wiretap evidence procured in violation of Title III may be suppressed. *See United States v.*

5  *Staffeldt*, 451 F.3d 578, 580 (9th Cir. 2006). Title III enumerates three types of statutory violations that

6  merit suppression: (1) an unlawful interception of communications; (2) an application or wiretap order

7  that is insufficient on its face; and (3) an interception "not made in conformity with the order of

8  authorization or approval." *Id.* (quoting 18 U.S.C. § 2518(10)(a)).

9

10                                    **DISCUSSION**

11  **1.      Standing**.

12          As a preliminary matter, the government argues that the defendants lack standing to challenge

13  the validity of the wiretap orders. Gov.'s Opp'n at 4. The Court may only exclude evidence on Fourth

14  Amendment grounds if the defendant can demonstrate that his own constitutional rights were violated

15  by an unlawful search or seizure. *Rakas v. Illinois*, 439 U.S. 128, 133-40 (1978). Moreover, a

16  "defendant's Fourth Amendment rights are violated only when the challenged conduct invaded his

17  legitimate expectation of privacy rather than that of a third party." *United States v. Payner*, 447 U.S.

18  727 (1980) (citing *Rakas*, 439 U.S. at 143). The wiretap statute confers standing upon "[a]ny aggrieved

19  person." 18 U.S.C. § 2518(10)(a). The statute defines "aggrieved person" as "a person who was a party

20  to any intercepted wire, oral, or electronic communication or a person against whom the interception

21  was directed." *Id.* § 2510(11). Thus, a defendant only has standing to move for suppression when he

22  is a party to an intercepted transmission, or "one against whom the search was directed, as distinguished

23  from one who claims prejudice only through the use of evidence gathered as a consequence of a search

24  or seizure directed at someone else." *Alderman v. United States*, 394 U.S. 165, 173 (1969); *see also*

25  *United States v. Oliva*, 705 F.3d 390, 395 (9th Cir. 2012) (affirming standing even where defendant

26  refused to admit that intercepted conversations included his voice or took place on his premises because

27  he was named in the intercept order and law enforcement believed he was using the target telephones).

28

**United States District Court**
For the Northern District of California

1    The government argues that the defendants lack standing to contest these wiretaps because, at

2   least as to the federal wiretap orders, at least three of the defendants are not "aggrieved persons" under

3   the wiretap statute because their conversations were not intercepted and their telephones were not

4   directly tapped.[3]  Gov.'s Opp'n at 6.  However, all four of the defendants are listed as "Target Subjects"

5   in the wiretap applications and orders.  Hanlon Decl. Exs. D-1, D-2, E-1, E-2.  Although it is true that

6   the federal wiretaps did not directly intercept the defendants' telephones, the defendants themselves

7   were targets of the intercept orders.  *See id.* Exs. D-1, E-1.  The defendants, therefore, were "person[s]

8   against whom the interception[s] w[ere] directed."  *See* 18 U.S.C. § 2510(11); *Oliva*, 705 F.3d at 395.

9   Accordingly, the Court finds that the defendants have standing to challenge the wiretap orders.

10

11   **2.     Probable Cause.**

12   The defendants first argue that the government lacked probable cause at the time it applied for

13   the state search warrants because the affidavits the government submitted in support of the warrant

14   applications failed to establish that communications regarding the target offenses would be found on

15   the wiretapped telephones.  Specifically, the defendants contend that the government did not establish

16   that any of the target telephones would be used to discuss the December, 2010 shootings.

17   The Ninth Circuit "require[s] only a reasonable nexus between the activities supporting probable

18   cause and the locations to be searched."  *United States v. Pitts*, 6 F.3d 1366, 1369 (9th Cir. 1993)

19   (quoting *United States v. Ocampo*, 937 F.2d 485, 490 (9th Cir. 1991)).  The issuing judge need only be

20   satisfied "that it would be reasonable to seek the evidence in the place indicated in the affidavit."  *Id.*

21   (citation omitted).  Probable cause does not require direct evidence that the evidence sought will be

22   found in the place searched.  *United States v. Angulo-Lopez*, 791 F.3d 1394, 1399 (9th Cir. 1986).

23   Instead, the issuing judge "is entitled to draw reasonable inferences about where evidence is likely to

24   be kept, based on the nature of the evidence and the type of offense."  *Id.*

25

26

27   [3] The government also asserts that the defendants should have submitted declarations explaining
     the factual basis on which they claim their expectations of privacy were violated.  Gov.'s Opp'n at 5.
28   However, the Court finds that the defendants amply supported their motion by providing, as exhibits,
     copies of wiretap applications and orders explicitly identifying the defendants as targets of wiretap
     surveillance.

5

**United States District Court**
For the Northern District of California

1        Before seeking the state wiretaps in May, 2011, the investigation into the December, 2010

2   shootings had revealed that they were committed by members of the 500 Block/C Street Gangs, as part

3   of ongoing feuds between those gangs on the one hand, and Sureño gangs and rival Norteño factions

4   on the other hand.  The affidavit submitted in support of the warrant detailed several types of evidence

5   establishing probable cause, including call and text message data related to the target telephones

6   acquired through previous search warrants, statements by victims of and witnesses to the shootings, and

7   information provided by confidential informants.  *See, e.g.*, Hanlon Decl. Exs. A-3, B-3, C-3.

8   Additionally, by the time the government sought the state warrants, Joseph Ortiz, believed to be the

9   principal shooter in both incidents, had fled to Mexico.

10       Additionally, several of the target telephones made phone calls to one another or sent text

11   messages close in time to the December, 2010 shootings.  *See* Hanlon Decl. Ex. A-3, at 3, 9, 49, 59-61,

12   62-66, 73, 82-83, 89-90, 93-96.  Previously intercepted communications from the target telephones

13   directly or indirectly referenced the shootings and their aftermath, including Joseph Ortiz's flight to

14   Mexico.  *See id.* at 31, 40, 55-56, 99.  Confidential informants and witnesses reported that members of

15   the 500 Block/C Street Gangs continued to discuss the shootings among themselves, both in person and

16   using their telephones.  *Id.* at 30-31, 40, 99.  Based on these facts, it was reasonable that the state court

17   judges concluded that there was a fair probability that evidence related to the December, 2010 shootings

18   would be found by wiretapping the target telephones.  Accordingly, the Court finds that the wiretap

19   orders were supported by probable cause at the time they were issued.

20       The defendants argue that, even if there was probable cause to believe that tapping the target

21   telephones would have yielded evidence of the December, 2010 shootings near the time they occurred,

22   the intervening lapse of five months before the warrants were sought rendered that probable cause stale.

23   Lapse of time alone does not negate probable cause.  *See United States v. Lacy*, 119 F.3d 742, 745 (9th

24   Cir. 1997).  In evaluating staleness, the Court looks at "the particular facts of the case and the nature of

25   the criminal activity and property sought."  *Id.*  "Information underlying a warrant is not stale 'if there

26   is sufficient basis to believe, based on a continuing pattern or other good reasons, that the items to be

27   seized are still on the premises.'"  *United States v. Schesso*, 730 F.3d 1040, 1047 (9th Cir. 2013)

28   (quoting *Lacy*, 119 F.3d at 745-46).  When an investigation relates to an ongoing criminal enterprise,

**United States District Court**
For the Northern District of California

1   a greater lapse of time is permissible between the activities the warrant affidavit describes, and the

2   issuance of the warrant. *United States v. Fisher*, 137 F.3d 1158, 1164 (9th Cir. 1998) ("Thus, evidence

3   of a criminal business operating at a particular location in the not-so-distant past may reasonably give

4   rise to a belief that a search of the location would yield further evidence.").

5          The state court wiretap orders were issued for the purpose of seizing evidence related to murder

6   and attempted murder. *See, e.g.*, Hanlon Decl. Ex. A-1.  However, while the murders and attempted

7   murders underlying the orders were isolated events, they related to an alleged ongoing criminal

8   enterprise: the 500 Block/C Street Gangs.  The shootings themselves took place in December, 2010, but

9   their repercussions continued to be felt by the members of those gangs in the subsequent months.

10   Particularly with Joseph Ortiz, the alleged shooter, still on the run, the information underlying the

11   wiretap orders was not rendered stale by the temporal gap between the shootings and the orders'

12   issuance.

13          The defendants further contend that the strategy laid out in the search warrant applications

14   indicates that the government lacked probable cause at the time the wiretap orders issued.  The wiretaps

15   the government sought were to include both an "unstimulated," and a "stimulated" phase.  Hanlon Decl.

16   Ex. A-3, at 106.  The "unstimulated" phase was intended to establish a baseline of communications on

17   the target telephones. *Id.* at 106-07.  During the "stimulated" phase, the investigators would attempt to

18   provoke discussion of the shootings. *Id.* at 107-09.  The defendants argue that the government lacked

19   probable cause, at least until the "stimulated" phase began.

20          The Court agrees that, if there was no probable cause before the "unstimulated" phase, the

21   issuance of the wiretap orders would have been improper. *See United States v. Grubbs*, 547 U.S. 90,

22   95 (2006) (approving the use of anticipatory search warrants, provided there is probable cause that

23   evidence will be found "when the warrant is executed").  However, because the Court has found that

24   there was probable cause for the wiretap orders to issue, even for the "unstimulated" phase of the

25   wiretaps, the government's stimulation strategy does not render the wiretap orders insufficient.

26          Accordingly, the Court finds that the wiretap orders were not facially invalid due to a lack of

27   probable cause.

28

**United States District Court**
For the Northern District of California

1  **3.      Particularity.**

2          The defendants next argue that the state wiretap orders were facially invalid because they failed

3  to describe the telephones to be searched with the requisite particularity.

4          A valid wiretap order must describe "the nature and location of the communications facilities

5  as to which, or the place where, authority to intercept is granted . . . ." 18 U.S.C. § 2518(4)(b).  This

6  statute applies to both landline and cellular telephones.  *Oliva*, 705 F.3d at 396 n.4.  "Although the

7  'nature and location' of a cellular phone cannot be described in the same way as that of a land line

8  phone, a cellular phone is itself a 'facilit[y]' that can be sufficiently identified by such features as its

9  telephone number, electronic serial number (ESN) or international mobile subscriber identity number

10  (IMSI)."  *Id.* (alteration in original).  A wiretap order may be valid even if it includes only one of the

11  three  possible  identifiers.  *See United States v. Duran*, 189 F.3d 1071, 1086 (9th Cir. 1999).

12  Significantly, even if a wiretap order is found not to describe the facility to be intercepted with sufficient

13  particularity, suppression is only mandated "where there is failure to satisfy any of those statutory

14  requirements that directly and substantially implement the congressional intention to limit the use of

15  intercept procedures to those situations clearly calling for the employment of this extraordinary

16  investigative device."  *United States v. Giordano*, 416 U.S. 505, 527 (1974).

17          The state wiretap orders identified each of the target facilities with the required particularity.

18  The wiretap orders identified each facility as either a landline or a cellular telephone.  Hanlon Decl. Exs.

19  A-1, B-1, C-1.  The orders further identified each telephone by its ten-digit telephone number, the

20  associated service provider, and the name of the listed subscriber.  *Id.*  Finally, the orders approved

21  interception of cellular telephones bearing different telephone numbers but the same ESN numbers and

22  subscriber information, as well as facilities bearing different ESN numbers but the same telephone

23  numbers and subscriber information.  *See id.* at Ex. A-1.  This information satisfies Title III's

24  particularity requirements by providing both the nature and the location of the facilities to be

25  intercepted.  *See* 18 U.S.C. § 2518(4)(b); *Duran*, 189 F.3d at 1086 (holding that suppression was not

26  the appropriate remedy for failure to include an ESN number on a wiretap order).

27          The defendants argue that failure to include an ESN number for each cellular telephone renders

28  the wiretap orders facially invalid.  They contend that, in the context of the changing technology

8

**United States District Court**
For the Northern District of California

1   associated with cellular telephones, a telephone number may be tied to more than one phone and

2   therefore an ESN number should be required for sufficient particularity.  However, the Ninth Circuit

3   has declined to suppress evidence where the wiretap order permitted monitoring of any phone number

4   that became associated with a particular ESN, *see Oliva*, 705 F.3d at 401, as well as where law

5   enforcement monitored a device with the same telephone number but a different ESN, *see Duran*, 189

6   F.3d at 1083.  The state wiretap orders evinced a "clear purpose" to monitor all phones associated with

7   the numbers identified in the orders.  *See Duran*, 189 F.3d at 1086 (holding that suppression was not

8   indicated where "the wiretap application contained sufficient information to establish probable cause

9   to wiretap any cell phone associated with the phone number identified in the order, and the order had

10   as its 'clear purpose' the authorization to tap all such phones").  Failure to include ESN numbers for the

11   cellular telephones did not render the wiretap orders invalid for lack of particularity.

12   The defendants further argue that, because the government included ESN numbers in its initial

13   application, and deleted them in its revised application, too much authority was delegated to law

14   enforcement to determine what constituted the "same" ESN numbers in the event of a changed phone

15   number.  The wiretap orders identified each target telephone by at least two pieces of information – the

16   ten-digit telephone number, and the subscriber information.  *See* Hanlon Decl. Ex. A-1.  Anyone

17   implementing the wiretap orders was permitted to monitor those telephone facilities in only three

18   situations: (1) where the ten-digit telephone number and the subscriber information precisely matched

19   that set forth in the orders and the ESN number never changed; (2) where the telephone number and the

20   subscriber information matched the order but was associated with changing ESN numbers; and (3)

21   where the subscriber information was associated with a particular ESN number, but the related

22   telephone number changed.  *See id.*  As discussed above, the orders had as their "clear purpose" the

23   intent to monitor all phones associated with the information set forth therein.  *See Duran*, 189 F.3d at

24   1086.  Thus, the wiretap orders did not delegate too much authority to law enforcement to determine

25   what phones to tap.

26   Therefore, the Court finds that the wiretap orders were not facially invalid due to insufficient

27   particularity.

28

9

**United States District Court**
For the Northern District of California

1    **4.      Justice Department Authorization.**

2         The defendants next argue that the first federal wiretap order is facially invalid because it went

3    beyond the scope of the AG authorization memo.  Specifically, the defendants contend that the AG

4    memo authorized a wiretap for the sole purpose of locating Joseph Ortiz, who was a fugitive from

5    justice at that time.  However, the wiretap order identified the "target offenses" as violations of 18

6    U.S.C. § 1959 (conspiring to and committing a violent crime in aid of racketeering), 18 U.S.C. § 924(c)

7    (using/carrying and possession of a firearm during and in relation to, and in furtherance of, a crime of

8    violence), and 18 U.S.C. § 924(j) (using/carrying and possession of a firearm during and in relation to,

9    and in furtherance of, a crime of violence, resulting in the death of a person).

10        Title III requires the government to adhere to a detailed process when applying for a wiretap.

11   The statute lays out a "bifurcated system of authorization involving review and approval by both the

12   executive and judicial branches."  *Staffeldt*, 451 F.3d at 580.  First, the officer wishing to secure a

13   warrant must seek permission from a senior Justice Department official to file an application with a

14   judge.  18 U.S.C. § 2516(1).  The AG may either approve the request personally, or delegate the duty

15   to a duly empowered high-ranking subordinate.  *Staffeldt*, 451 F.3d at 580.  After the AG approves the

16   request, the officer must file an application with a judge.  *Id.*  In addition to  including a probable cause

17   statement and a statement describing the necessity of obtaining a wiretap order, the application must also

18   "show that a properly designated Justice Department official, who must be identified, authorized the

19   request for the particular wiretap sought in the application."  *Id.*  The reviewing judge must then

20   determine that the application complies with the statutory requirements before issuing the wiretap order.

21   *Id.*

22        The defendants do not contend that this rigorous procedure was not followed in this case.

23   Rather, the defendants argue that the AG authorized an application for a wiretap with a narrower focus

24   than that eventually obtained.  The defendants rely on language from the AG's authorization

25   memorandum, which states, in relevant part:

26            This is with regard to your recommendation that an appropriately
              designated official of the Criminal Division authorize an application to
27            a federal judge of competent jurisdiction for an order under Title 18,
              United States Code, Section 2518 . . . in connection with an investigation
28            concerning the location of Joseph Ortiz, a fugitive from justice from

**United States District Court**
For the Northern District of California

1

2

> possible violations of Title 18, United States Code, Sections 924 and 1959 . . . .
>
> . . . acting under this delegated power, the appropriately designated official authorizes the above-described application to be made by any investigative or law enforcement office of the United States . . . .

Hanlon Decl. Ex. D-4. The authorization memo also describes the other offenses[4] and target subjects listed in the application. *Id.* The defendants contend that the language "with an investigation concerning the location of Joseph Ortiz" effectively limited the scope of the wiretap application and eventual order to the search for Joseph Ortiz. The Court disagrees with the defendants' construction of the authorization memo.

The better reading of the authorization memo is that the AG intended in the first paragraph to paraphrase the government's application. In its papers, the government asserts that, before it presented its application to the Court, it first presented the identical application to the AG.[5] Gov.'s Opp'n at 30. ("Indeed, the Criminal Division of the Department of Justice reviewed the specific wiretap application before its submission to the Court, and the version submitted to the Court was exactly what the Department of Justice authorized."). In the second paragraph, where the AG approves "the above-described application," the more logical reading is that the AG intended to approve the application the government had submitted – the same application the AG described in the memorandum's first paragraph. Thus, the Court finds that the description set forth in the first paragraph only served to identify the matter the AG was reviewing, not to limit the scope of the investigation.

The defendants argue that such a reading effectively ignores the first paragraph of the authorization memo, rendering the authorization invalid. *See Staffeldt*, 451 F.3d at 579 (holding that suppression was required where the authorizing memorandum did not include any information specific to the wiretap sought). However, this reading does not ignore the AG's description. Instead, it

---

[4]Although other offenses are listed in the wiretap application, the only listed offenses that are capable of serving as predicate offenses for purposes of Title III are the alleged violations of Sections 924 and 1959.

[5]The Court notes that the government has not provided any declarations in support of this factual assertion. The defendants do not dispute the government's statement that it presented the AG with the identical application that it later presented to the Court. Therefore, at this time, the Court accepts as true that the AG reviewed this precise application before issuing the required authorization.

**United States District Court**
For the Northern District of California

1  recognizes that the AG first described the application under review, and then approved "the above-

2  described application."

3      Accordingly, the Court concludes that the Justice Department did not intend to limit the scope

4  of the wiretap to the apprehension of Joseph Ortiz.  Therefore, the first federal wiretap is not facially

5  invalid on this basis.

6

7  **5.      Overbreadth.**

8      The defendants' final argument also concerns the scope of the first federal wiretap.  The

9  defendants contend that the first federal wiretap order was facially deficient because it provided for

10 continued surveillance, even after such time as Joseph Ortiz was apprehended.  Def.s' Mot. at 49-52.

11  In short, the defendants argue that, because the wiretap's only permissible purpose was to gather

12 evidence leading to the capture of Joseph Ortiz, the wiretap order is fatally deficient because it permitted

13 continued monitoring until the government's investigative goals were fully achieved. *Id.* at 49-50. This

14 argument is dependent upon the defendants' previous argument regarding the scope of the AG's

15 authorization.

16     Because the Court has already determined that the wiretap's investigative goals were not

17 restricted to evidence leading to the capture of Joseph Ortiz, the first federal wiretap order is not facially

18 deficient because it permitted continued monitoring even after he was captured.

19

20                              **CONCLUSION**

21     For the foregoing reasons and for good cause shown, and on the basis of the record before it, the

22 Court hereby DENIES the motion to suppress wiretap evidence.  This Order resolves Docket No. 728.

23

24     **IT IS SO ORDERED.**

25

26 Dated: December 27, 2013

27                                     SUSAN ILLSTON
                                       UNITED STATES DISTRICT JUDGE
28